IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHELLEY GATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 10-1129-GMS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM**

## I.    INTRODUCTION

The plaintiff Shelley Gates ("Gates"), who appears *pro se*, appeals the decision of

Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying her claim for

disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  The parties have filed

cross-motions for summary judgment.[1]  (D.I. 22, 24.)  The court has jurisdiction pursuant to 42

U.S.C. § 405(g).[2]

---

[1]Gates submitted after acquired evidence in support of her appeal.  (*See* D.I. 3, 23.)
Evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not
supported by substantial evidence. *See Matthews v. Apfel*, 293 F.3d 589, 594 (3d Cir. 2001).  In
addition, Gates filed a motion for extension of time to file a reply brief.  The court considers her
answering brief (D.I. 27) and, therefore, will deny the motion as moot.

[2]Under § 405(g), [a]ny individual, after any final decision of the Commissioner of Social
Security made after a hearing to which he was a party . . . may obtain a review of such decision
by a civil action commenced within sixty days after the mailing to him of notice of such decision
. . . .  Such action shall be brought in the district court of the United States for the judicial district
in which the plaintiff resides. . . ." 42 U.S.C. § 405(g).

Gates applied for DIB and SSI benefits on February 6, 2008, alleging disability as of January 17, 2008, due to system lupus erythematosus[3] ("SLE") and hypertension. (D.I. 14, Tr. 139-51.) Her initial application was denied initially and upon reconsideration. (*Id.* at 83-89.) Thereafter, Gates requested a hearing, which took place before an administrative law judge ("ALJ") on January 26, 2010. Counsel represented Gates at the hearing, and Gates and a vocational expert ("VE") testified. (*Id.* at 39-81.) The ALJ found that Gates is capable of performing her past relevant work as a social worker, medical social worker, and respite coordinator and that the work does not require the performance of work-related activities precluded by Gate's residual functional capacity ("RFC"). (D.I. 15, Tr. 25 ¶ 6.) However, the body of the decision found that Gates is unable to return to her past relevant work, but could perform unskilled light work as identified by the VE.[4] (*Id.* at 26-28.) Gates sought review by the Appeals Council, but it denied her request for review and, therefore, the ALJ's decision became the final agency decision subject to judicial review. (*Id.* at 1-5, 132-33.) On December 22, 2010, Gates, now proceeding *pro se*, filed the current action for review of the final decision. (D.I. 1.)

## II.    BACKGROUND

Gates was born on January 14, 1962, and is a college graduate. (D.I. 14, Tr. 39.) She has

---

[3]A chronic multisystemic inflammatory disease with variable features, frequently including fever, weakness and fatigability, joint pains or arthritis, skin lesions on the face, neck or upper extremities, and often affecting the kidneys, spleen, and various other organs. *The American Heritage Stedman's Medical Dictionary* 804 (2d Ed. 2004).

[4]The contradictory finding appears to be harmless error and, standing alone, is not a ground for remand. *See e.g., Ngaruih v. Ashcroft*, 371 F.3d 192, 190 n.8 (8th Cir. 2004). As will be discussed, there exist other grounds requiring remand.

past relevant work as a medical social worker and respite care coordinator. (*Id.* at 41-44.) Gates
was hospitalized in January 2008 and stopped working at that time. (*Id.* at 46.)

## A.    Medical Evidence

Gates was diagnosed with lupus in 2003, and is followed by rheumatologist Philip S.
Schwartz, M.D. ("Dr. Schwartz") for the condition. (D.I. 15, Tr. 688.) She is also followed by
neurologist Douglas B. Gersh, M.D. ("Dr. Gersh"). On June 8, 2006, Dr. Gersh, evaluated Gates
for complaints of syncope (dizziness). (D.I. 14, Tr. 252.) Examination revealed normal findings
and no obvious evidence of a neurological disease. (*Id.* at 252.) Gates' history suggested
orthostatic hypotension which may be medication related. He recommended an MRI of the
brain, an EEG, and a cardiac evaluation. The EEG study was normal and the MRI revealed a
right frontal venous angioma which is an "incidental" and "purely benign" finding. (*Id.* at 253,
262, 280.) Dr. Gersh examined Gates on July 14, 2006 and found full range of motion of her
back with no tenderness. (*Id.* at 262.) Mental status examination and motor examination were
normal. (*Id.*)

Nephrologist Dr. Helen Chang-DeGuzman ("Dr. Chang-DeGuzman") has treated Gates
since September 25, 2006. (D.I. 15, Tr. 688.) Medical notes dated September 25, 2006 refer to
Gates' longstanding history of hypertension, not under good control. (*Id.*) There was mild renal
insufficiency. (*Id.* at 690.) Laboratory results indicated anemia, but there was no definite
evidence of lupus nephritis.[5] (*Id.* at 689-90.) A renal ultrasound indicated the echogenic kidneys
were related to her hypertension. (*Id.* at 690.)

---

[5]Glomerulonephritis that occurs with systemic lupus erthematosus and is characterized b
hematuria progressing to renal failure. *The American Heritage Stedman's Medical Dictionary*
472 (2d ed. 2004).

3

In a follow-up note dated March 5, 2007, Dr. Schwartz recommended that Gates restart Prednisone to see if she could tolerate it. (D.I. 14, Tr. 289.) Gates returned to Dr. Gersh on March 30, 2007, complaining of memory "troubles." (*Id.* at 264-65.) He indicated that Gates "had been misinformed that lupus might impair her memory." (*Id.* at 265.) Dr. Gersh noted that Gates was depressed. (*Id.* at 264.) He noted that she had not had seizures, had no peripheral neuropathy, no cranial neuropathy, and no neurological complications of lupus. (*Id.* at 265.) Gates' physical examination was normal, and her blood pressure was 120/70. (*Id.*) There was no objective evidence of nervous system disease, and Gates did not have a memory problem. (*Id.* at 266.) Dr. Schwartz's April 20, 2007 note indicates that Gates had a relatively good response to restarting the Prednisone. (*Id.* at 287.)

Gates is treated by cardiologist Gaetano N. Pastore, M.D., F.A.C.C. ("Dr. Pastore"). Dr. Pastore's June 15, 2007 notes indicate that he had last seen her over a year ago. Her blood pressure was elevated, and Dr. Pastore noted that it is difficult to control because of an "issue of poor compliance." (*Id.* at 246.) Dr. Pastore added Norvasc to Gates' medications. (*Id.* at 245-46.)

Psychologist Glen Greenberg, Ph.D., ("Dr. Greenberg") evaluated Gates on June 27, 2007 regarding her cognitive complaints. (*Id.* at 274-78.) Dr. Greenberg concluded that the major issue is depression, while some neurocognitive problems secondary to SLE seem to be present and to some degree contributory in Gates' work efficiency. Gates seemed to have the cognitive resources to continue to manage her job adequately. (*Id.* at 278.) Dr. Greenberg recommended that Gates be considered for an antidepressant and counseling. (*Id.*)

4

As of July 2, 2007, Gates' renal function was stable, but Gates had not increased the medication as prescribed, and her blood pressure was not well controlled. (D.I. 15, Tr. 680.) When Gates presented to Dr. Gersh on July 6, 2007, her blood pressure was 120/70, and the physical and neurological examinations were normal. (*Id.* at 271.) Dr. Gersh prescribed Cymbalta for depression. (*Id.*) Gates underwent an echocardiogram study on July 25, 2007 upon Dr. Pastore's order, and it revealed a mild concentric left ventricular hypertrophy, a normal left ventricular systolic function, and a mild degree of aortic insufficiency. (*Id.* at 248.)

When Gates next presented to Dr. Chang-DeGuzman on September 17, 2007, she noted that Gates was taking her medication and that her hypertension was better controlled. (D.I. 15, Tr. 677.) Dr. Chang-DeGuzman states, "I am sure she does have underlying lupus nephritis." (*Id.* at 677.) Gates presented to Dr. Pastore on September 21, 2007, she was "doing well" from a cardiac point of view, and her blood pressure was much better controlled. (*Id.* at 243-44.)

At Gates' October 2, 2007 visit, Dr. Gersh noted her blood pressure was 122/80, and physical and neurological examinations were normal. (D.I. 14, Tr. 280.) At the time, Gates was non-compliant with Cymbalta. (*Id.* at 279-80.) Dr. Gersh noted that Gates did not have a neurologic complication of lupus, but was willing to continue following her as "she is perhaps liable to develop one." (*Id.* at 281.) On November 13, 2007, Gates' blood pressure was 100/70 in the left arm and 110/84 in the right arm. (D.I. 15, Tr. 674.)

Gates was hospitalized for a two-week period beginning January 18, 2008 for uncontrolled hypertension, acute lupus, depression, and inguinal lymphadenopathy. (D.I. 14, Tr. 291-364; D.I. 15, Tr. 661, 665-68.) On February 26, 2008, Dr. Chang-DeGuzman saw Gates for follow-up. (D.I. 15, Tr. 661.) Dr. Chang-DeGuzman increased Gates' medication for

5

hypertension and SLE. (*Id.* at 662.) She discussed with Gates her suspicion of underlying lupus nephritis. (*Id.*) Gates told Dr. Chang-DeGuzman that she was stressed about her work situation and that perhaps she would be willing to work part-time. (*Id.*) Dr. Chang De-Guzman signed a letter excusing Gates from work from February 1 to February 26, 2008. (*Id.* at 664.)

Dr. Pastore's notes from a April 21, 2008 visit, that Gates was "doing okay" from a cardiac point of view. (D.I. 14, Tr. 370.) She had a left carotid bruit and he asked her to undergo a carotid ultrasound. (*Id.*) When Gates presented to Dr. Gersh on April 25, 2008, her blood pressure as 125/80. (*Id.* at 453.) Gates complained that she was having bad dreams and attributed it to Cymbalta. (*Id.* at. 452). Dr. Gersh discontinued the medication. (*Id.* at 452-53.) Gates' physical and neurological examinations were normal. (*Id.* at 453.) Dr. Gersh recommended Gates seek psychiatric treatment. (*Id.*)

On June 17, 2008, Dr. Chang-DeGuzman reported that Gates' hypertension was much better controlled. (D.I. 15, Tr. 655.) Because Gates' blood pressure was under better control, Dr. Chang-DeGuzman recommended a renal biopsy. (*Id.*) Results of the renal biopsy confirmed a diagnosis of lupus membranous nephritis. (*Id.* at 644.) Gates was advised that the biopsy report indicated no significant signs of chronic injury and minimal proteinuria, as well as no features of proliferative lupus nephritis. (*Id.*) The biopsy report showed a "very good prognosis for Gates' lupus kidney disease." (*Id.*) Dr. Chang-DeGuzman noted that Gates' blood pressure "seems to be very well-controlled at this point" with a reading of 120/70. (*Id.*) She continued Gates on the lupus medication and an ACE inhibitor. (*Id.*) Dr. Chang-DeGuzman further noted that Gates complained of some depression and feeling confused at times, but she was still able to function

"very well." (*Id.*) Gates had a rash on her face, "vague aches and pains, and vague symptoms." (*Id.*)

Dr. Gersh completed a questionnaire from Gates' employer's disability insurance carrier on June 20, 2008 that stated there was no neurological reason why Gates could not work, but indicated that she may not be able to because of lupus. He suggested that Gates' rheumatologist be contacted. (*Id.* at 455.)

Gates returned to Dr. Schwartz on July 2, 2008. His notes refer to Gates' history of lupus accompanied by arthritis-related symptoms, and possible lupus nephritis. (D.I. 15, Tr. 608.) Dr. Schwartz planned a biopsy to explore her symptoms. (*Id.*) Her blood pressure was 122/76, and she looked well. (*Id.*) Dr. Schwartz prescribed Darvocet for the musculoskeletal pain complaints. (*Id.*)

Gates presented to Dr. Gersh on July 15, 2009, with complaints of nonspecific aches and pains. (*Id.* at 1087.) A neurological examination indicated normal findings. (*Id.*) When Gates presented to Gersh on November 17, 2009, her blood pressure was 125/80. (*Id.* at 1084.) He noted chronic pain, particularly in the spine and ordered an MRI to look for serious structural problems of the joints that might be related to lupus. (*Id.*)

Dr. Chang-DeGuzman saw Gates on November 19, 2009, and noted that Gates had improved her life style and general health by making better food choices and staying away from alcohol. (*Id.*) Gates' renal function was stable. (*Id.*) On January 7, 2010, Dr. Chang-DeGuzman reported that Gates' blood pressure of 128/90 was under "decent control," and Gates was "doing okay" without any major renal problems, chest pain, shortness of breath, or elevated blood pressure. (*Id.* at 1172.)

Gates' primary care physicians are at the Glasgow Family Practice. She has seen several physicians there since 2000 and it continues to provide primary care to her. (D.I. 14, Tr. 107, 471-604; D.I. 15, Tr. 802-1021.) While Dr. Gregory D. Adams ("Dr. Adams") signed off on the computer generated progress notes, the progress notes indicate by initial which physician actually saw Gates. For example, the note might state, "Seen by: rbs," a reference to Rhoneise Barnett-Smith ("Dr. Barnett-Smith"). (D.I. 14, Tr. 479.) Dr. Adams also signed off on referrals to specialists for other medical evaluation and treatment. Gates identifies Dr. Barnett-Smith as her primary care physician, and Dr. Barnett-Smith indicates that Gates has been seen by her since April 2008. (*Id.* at 107, 200.)

The Glascow Family Practice records indicate that Gates was "seen by rbs" (i.e., Rhoneise Barnett-Smith) on the following dates: in 2008, on June 6, June 17, July 29, August 5, October 7, November 12, and December 30; and in 2009, on January 28, February, 23, May 5, June 29, August 6, August 18, September 9, and November 11. (D.I. 14, Tr. 478-79, 539-40; D.I. 15, Tr. 812-14, 817-223, 838-29, 838-43, 845-48, 851-52, 858-61, 867-68, 1071-73.) In addition, Dr. Barnett-Smith made referrals for Gates' care on August 8, 2008, and January 28, February 23, July 30, and September 9, 2009. (D.I. 15, Tr. 894-96, 986-88, 990, 992.) Finally, the Glascow Family Practice records contain "messages" showing Dr. Barnett-Smith's involvement in Gates' care on the following dates: June 17, August 8, and August 8, 2008; and January 30, February 16, May 19, July 28, July 30, and September 9, 2009. (D.I. 15, Tr. 919-20, 923-25, 939-40, 944, 946-48, 950, 964-67, 981.)

Dr. Barnett-Smith submitted medical source statements and RFC assessment regarding Gates' condition on the following dates: August 5, 2008, February 23, 2009; September 14,

8

2009; January 18, 2010, January 20, 2010. (*Id.* at 641, 795-801, 1022-25, 1181-89, 1196-201.)

### B. January 26, 2010 Administrative Hearing

#### 1. Gates' testimony

Gates was represented by counsel and testified at the hearing. Gates testified that she was hospitalized in January 2008 and, following the hospitalization, never returned to work. (*Id.* at 46.) As of the date of the hearing, Gates was on long-term disability through her employer's insurance. (*Id.*)

Gates testified that the impairments that preclude her ability to work include fatigue, systemic lupus, swelling, stiffness, pain in her joints and muscles, dizziness, lightheadedness, occasional faintness, insomnia, and hypertension. (*Id.* at 48, 50, 52, 53.) She has pain in her feet, hands, elbow, and/or knees. (*Id.* at 70.) When Gates takes medication, the pain is five (on a scale of one to ten with ten as the worst) and without the medication the pain is one.[6] (*Id.* at 51.)

She described a "bad day" versus a "good day." (*Id.* at 71.) A bad day occurs when "the pain and swelling in [her] joints and muscles is pretty consistent and severe." It makes it difficult [] to sit or stand. It's even difficult to get out of bed. It's difficult [] to stand in a shower because of fatigue on top of this, walking, climbing." (*Id.* at 71-72.) On a good day, Gates can "manage to prepare a pretty decent meal . . . stand in the shower . . . wash dishes, maybe do some light housework . . . go out in the community . . . grocery shop." (*Id.* at 72.)

When the lupus flares, it causes calluses on the ball of the fingertips, numbness, pain, swelling, and stiffness of the fingers, hands, elbows, feet, toes, neck, chest, and upper back, oral

---

[6]Given that Gates testified that she has no pain tolerance, it appears she reversed the pain scale.

9

and nasal ulcers and ulcers beneath the skin of the fingers and hands, corneal abrasions, rashes, and sensitivity to light. (*Id.* at 50, 52, 72-73.) The lupus is treated by a rheumatologist and Gates takes medication for the condition. (*Id.* at 49.) The lupus also causes kidney disease which is treated by a nephrologist. (*Id.* at 54.)

Gates is also treated by a neurologist who prescribes medication for depression. (*Id.* at 56.) In the past, she was treated by a neurologist/psychiatrist. (*Id.*) Gates indicated that she has problems with long-term and short-term memory, is not as patient as she once was, and gets a little anxious. (*Id.* at 58-59, 61.) On occasion, she hears her mother's voice, has ringing in her ears, and has trouble hearing. (*Id.* at 60.)

Gates has been prescribed medication for insomnia, but at the time of the hearing she was waiting for authorization from her insurance company. (*Id.* at 53.) She sleeps two to four hours, dozing off and on. (*Id.*) As of the hearing date, her blood pressures was "being maintained at a pretty good level compared to [her] history." (*Id.* at 54.)

Gates is able to drive. (*Id.* at 40.) She was prescribed a cane to aid in ambulation when she feels particularly tired or at night. (*Id.* at 54.) She is able to use a cell telephone and a computer. (*Id.* at 59.) At times she has difficulty holding items, but it depends upon her symptoms. (*Id.* at 62.) In addition, she has had numbness and tingling in her hands. (*Id.*)

Gates can walk one-quarter to one-half block before stopping to rest. (*Id.* at 63.) She is able to use stairs with the use of a handrail. (*Id.* at 64-65.) She estimates that she can stand two to six minutes without any support and can sit between twenty and seventy minutes before getting up and constantly shifting. (*Id.* at 65.) She can lift an item that weighs less than a gallon of milk. (*Id.*) On a good day she can bend at the waist, kneel with difficulty, make the bed and

change the sheets, buy groceries, and keep track of her finances. (*Id.* at 66, 68.) She has

difficulties with her daily grooming activities. (*Id.*) She is able to prepare simple meals and has

difficulty with cleaning chores. (*Id.* at 67.)

### 2.    The Vocational Expert

Following Gates' testimony, the ALJ consulted the VE. The VE classified Gates' prior

relevant work (social worker, medical social worker, respite coordinator) as skilled and

sedentary. (D.I. 14, Tr. 75.) The VE testified that a person who had performed those

occupations would have the skills that would transfer, assuming the jobs were light-level jobs.

(*Id.* at 76.)

The ALJ then asked the VE to consider the following hypothetical question:

> I'll be asking you to consider an individual who is the claimant's stated age at
> onset, that would be 46 years. This hypothetical person has both a high school
> and a four-year college degree, is able to read, write, and do at least simple math.
> There are certain underlying impairments that place limitations on the ability to do
> work-related activities. We'll start with a light level of exertion.[7] Posturals are all
> occasional but there should be no climbing of a ladder, rope, or a scaffold.
> Handling, fingering, feeling would be frequent as opposed to constant.
> Environmentally this is a person who should avoid concentrated exposure to
> temperature extremes, odors, dust, gases, poor ventilation, background noise, and
> hazards. With this hypothetical in your opinion could such a person do any of the
> claimant's past relevant work?

---

[7]Light work is defined in the Social Security Regulation as follows:  (b) Light work
involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this
category when it requires a good deal of walking or standing, or when it involves sitting most of
the time with some pushing and pulling of arm or leg controls.  To be considered capable of
performing a full or wide range of light work, you must have the ability to do substantially all of
these activities.  If someone can do light work, we determine that he or she can also do sedentary
work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit
for long periods of time.  20 C.F.R. § 404.1567(b).

(*Id.* at 76.) The VE responded, "they could do all of the past occupations." (*Id.*) The ALJ

changed the hypothetical to include "certain underlying impairments that would place additional

limitations to work that would be simple, unskilled type or work."[8] (*Id.* at 76-77.) With the

added limitation, the VE testified it would eliminate all of the past occupations. (*Id.*) The ALJ

next ask the VE if there were any simple unskilled work such a person could do in the regional or

national economy that would fit within the parameter of the second hypothetical and to consider

the claimant's age, education and work background and if an individual is able to do light or

even sedentary work.[9] (*Id.* at 77.) The VE testified that at the light-duty unskilled exertional

base, the individual could perform the occupations of garment sorter, recreation aide, folder,

addresser, document preparer, and surveillance systems monitor and that these jobs exist in

significant numbers in the local and national economies. (*Id.* 77-78.) Finally, the ALJ asked the

VE to add the factor that the individual ambulated with a cane. (*Id.* at 78.) The VE responded

that said factor would not affect the past relevant work, but it would eliminate the light-duty jobs

if they required bilateral carrying, but the sedentary jobs could remain. (*Id.* at 79.)

Counsel for Gates asked the VE to consider the medical source statement (D.I. 15, 1183-

89) by Dr. Barnett-Smith[10] and whether a person with those limitations would have the ability to

---

[8]The "certain underlying impairments" were not identified by the ALJ.

[9]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

[10]The ALJ determined that the record did not reflect evidence that Gates was ever treated by Dr. Barnett-Smith and, therefore, did not accept or give any weight to her opinions. (D.I. 14, Tr. 24.)

work on a full-time basis. (D.I. 14, Tr. 80.) The VE responded that even low-stress jobs would be eliminated, it would preclude unskilled work or any kind of employment, working a full workday, and eliminate any kind of competitive employment. (*Id.* at 80-81.)

### C.   The ALJ's Findings

Based on the factual evidence and the testimony of Gates and the VE, the ALJ determined that Gates was not under a disability within the meaning of the Social Security Act from January 17, 2008 through February 25, 2010, the date of her decision. (D.I. 14, Tr. 16-28.)   The ALJ's findings are summarized as follows:[11]

> 1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2.   The claimant has not engaged in substantial gainful activity since January 17, 2008, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).
>
> 3.   The claimant has the following severe impairments:  SLE (systemic lupus erythematosus) (20 C.F.R. § 404.1520(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.
>
> 5.   The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except with frequent handling, and avoiding temperature extremes, dust and gasses, background noises, and hazards.
>
> 6.   The claimant is capable of performing past relevant work as a social worker, medical social worker, and respite coordinator.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

---

[11]The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

7.  The claimant has not been under a disability, as defined by the Social Security Act, from January 17, 2008 through the date of the decision (i.e., February 25, 2010) (20 C.F.R. § 404.1520(f)).

(D.I. 14, Tr. 16-28.)

## III.  STANDARD OF REVIEW

### A.  Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party [,]' but [refraining from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).  If the court determines that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ .P. 56(c)).

### B.  Review of the ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Rather, it has been defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

14

Credibility determinations are the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed. R. Civ. P. 56(c). *See Woody v. Secretary of the Dep't of Health & Human Serv.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.   DISCUSSION

### A.   Regulatory Framework

Within the meaning of social security law, a "disability" is defined for purposes of both DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." *See* 20 C.F.R. §§ 404.1505, 416.905. The claimant bears the initial burden of proving disability. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Podeworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984). To qualify for disability insurance benefits, the claimant must establish that she was disabled prior to the date she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

15

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520; 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(I), 416.910(a)(4) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, at step three the Commissioner, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful work.[12] *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's

---

[12]Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii-iii), 416.920(a)(4)(ii)(iii).

16

impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(d), 416.920(e).[13]

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4 )(iv), 416.920(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work). "The claimant bears the burden of demonstrating an inability to return to [her] past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. As previously stated, at this last step the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with hers medical impairments, age, education, past work experience, and [RFC.]" *Id.* This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments and a vocational expert is often consulted.

At step one, the ALJ found that Gates met the insured status requirements of the Social Security Act through December 31, 2011, and that she had not engaged in substantial gainful

---

[13]Prior to step four, the Commissioner must assess the claimant's RFC. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

activity since January 17, 2008. At step two, the ALJ found that Gates has the severe impairment

of systemic lupus erythematosus. At step three, the ALJ determined that Gates' impairment does

not meet or medically equal the listing criteria. At step four, the ALJ determined that Gates

could perform her past relevant work. Nonetheless, the ALJ proceeded to step five and

concluded that Gates has the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b)

except with frequent handling, and avoiding temperature extremes, dust and gasses, background

noises, and hazards, and that Gates' past relevant work as a social worker, medical social worker,

and respite coordinator did not require the performance of work-related activities precluded by

her RFC. The ALJ concluded that Gates has not been under a disability, as defined by the Social

Security Act, from January 17, 2008, through the date of the ALJ's February 25, 2010 decision.

### B.    Whether the ALJ's Decision is Supported by Substantial Evidence

Gates objects to the Commissioner's determination on the following grounds:  (1) the

ALJ afforded improper weight to the opinions of her treating physician, Dr. Barnett-Smith and

gave greater weight to non-treating and non-examining state agency physicians; (2) The ALJ

found there was no evidence that Dr. Barnett-Smith treated her, even though Dr. Barnett-Smith

prescribed medication, ordered tests, and referred her for specialist consults; (3) the ALJ failed to

support the RFC findings in spite of several reports by her primary physician concluding that she

is incapable of even sedentary work; (4) every source credited by the ALJ reported different

limitations than those listed in the RFC findings; and (5) the VE noted restrictions that would

preclude all work.

The Commissioner moves for summary judgment on the grounds that: (1) substantial

evidence supports the ALJ's decision; (2) the ALJ correctly considered the medical opinion

evidence of record; and (3) the court should disregard the after acquired evidence submitted by Gates.

When an ALJ accepts the opinion of the non-examining state agency physician, the ALJ is required to include the functional limitations identified by that source in the RFC finding and hypothetical question. *See Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004). Further, the ALJ explicitly must weigh all relevant, probative and available evidence and provide some explanation for the rejection of probative evidence that would suggest a contrary disposition. *Adorno v. Shalala*, 40 F.3d 43, 48 (3rd Cir. 1994) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) and *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986)). Conclusory statements are beyond meaningful judicial review. *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). An ALJ's decision must be accompanied by a clear and satisfactory explanation of the basis on which it rests in order for the court to properly decide whether the ALJ's decision is based upon substantial evidence. *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981).

In considering the medical opinion evidence in the instant case, the ALJ did not "accept or give any weight" to Dr. Barnett-Smith's opinions on the basis that there was no evidence that Gates was ever treated by her. In addition, the ALJ found it "curious" that Dr. Adams submitted no RFC opinions or medical source statements of record. Contrary to the ALJ's findings, and while Dr. Adams may have signed the computerized progress notes from the Glasgow Family Practice, it is readily apparent from the progress notes that Gates was "seen by rbs" (i.e., Rhoneise Barnett-Smith) throughout 2008 and 2009. The ALJ's total rejection of Dr. Barnett-Smith's opinion (due to her apparent misreading of the Glasgow Family Practice records) on the

19

basis that Dr. Barnett-Smith was not Gates' primary care physician and had no involvement in Gates' medical care is not supported by substantial evidence of record. Accordingly remand on this issue is appropriate.

The ALJ gave "great weight" to the June 27, 2007 opinion of psychologist Dr. Greenberg and found the June 17 and July 9, 2008 opinions of state agency medical consultant Dr. M. H. Borek ("Dr. Borek") supported by the treatment notes of record. (D.I. 14, Tr. 25, 274-78; D.I. 610-17.) The record reflects, however, that the ALJ's hypothetical questions did not include Dr. Borek's limitations that the Gates could stand or walk for at least two hours in an 8 hour day, and sit for 6 hours in an 8 hour day with an unlimited ability to push and pull. Nor did the hypothetical questions make reference to the opinions of Dr. Greenberg or other limitations imposed by the ALJ in her conclusions. Given the Third Circuit's mandate to include everything in a hypothetical based on an RFC, remand is appropriate.

For these reasons, the court finds remand is appropriate for a more comprehensive evaluation.[14]

## V.   CONCLUSION

For the aforementioned reasons, the court remands the case for further proceedings consistent with this memorandum. Gates' motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.

_____, 2012
Wilmington, Delaware

CHIEF, UNITED STATES DISTRICT JUDGE

---

[14]In light of the court's findings, it is unnecessary to address the parties' remaining arguments.

20